**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**AT MARTINSBURG**


TIMOTHY ROSE et al.,

      Plaintiffs,

v.                               Civil Action No. 03:04CV100
                                    (BROADWATER)

KATRINA SINE, et al.,

      Defendants.


**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AND DENYING**
**MOTION FOR SANCTIONS AS MOOT**


On the 18th day of July 2005, the above styled matter came before the Court for consideration of Defendants' Motion for Summary Judgment. As Plaintiffs entered no objection to the facts or the law as set forth in the Defendants' motion for Summary Judgment, and for the reasons set forth below and elsewhere on the record, the motion is hereby GRANTED.


## I.  FACTS

The eldest of the Rose children ("M. Rose") was a student at Capon Bridge Elementary School in October of 2002.  On October 4, 2002, the Capon Bridge Elementary School referred reports of suspected child sexual abuse from M. Rose's teacher, Peggy Lafollette, to the West Virginia Department of Health and Human Resources ("DHHR" or "the Department").  Katrina Slijaz (formerly, Ms. Katarina Sine, one of the named defendants), a child protective services worker, traveled to Capon Bridge Elementary School to interview M. Rose regarding the allegations.

After interviewing M. Rose and Peggy Lafollette at Capon Bridge Elementary School, Ms. Slijaz presented a request for emergency custody of M. Rose and her two sisters to Shirley Timbrook, the Juvenile Referee.  Shirley Timbrook signed an Order Ratifying Emergency Custody on October 4,

2002. Timbrook found that Mr. and Mrs. Rose's care and custody of the Rose children posed an imminent danger to the physical well-being of the Rose children and there existed probable cause to believe that additional abuse would occur if they were not removed.

Timbrook's Order Ratifying Emergency Custody further included findings that the danger presented to the Rose children, under the then present circumstances, created an emergency situation. Due to the emergency situation, efforts to avoid removing the children from the Rose household would be unreasonable or impossible. On October 4, 2002, the Judge of the Circuit Court for Hampshire County, West Virginia, confirmed the Juvenile Referee's Order Ratifying Emergency Custody of the Rose children.

M. Rose was removed from Capon Bridge Elementary School by Ms. Slijaz and Jodi Miller, another child protective services worker, after the Order Ratifying Emergency Custody was entered. Slijaz and Miller proceeded to the Rose home, where Mr. and Mrs. Rose were immediately given a copy of the Emergency Custody Order signed by the Juvenile Referee and confirmed by the Judge of the Circuit Court of Hampshire County.

On October 7, 2002, Steve Moreland, the Hampshire County Prosecuting Attorney, filed a petition on behalf of Katrina Sine (Slijaz) in the Circuit Court of Hampshire County, West Virginia. The Prosecuting Attorney's petition sought an order directing that legal and physical custody of the Rose children remain with DHHR. The presiding circuit court judge entered a temporary order providing that legal and physical custody of the Rose children would remain with DHHR, pending a preliminary hearing. The presiding circuit judge found that, based on the facts alleged in the petition, there existed imminent danger to the physical well-being of the Rose children. The Court also appointed Joyce Stewart, Esquire, as the Rose children's Guardian Ad Litem.

The preliminary hearing required by the October 7, 2005, order was held on October 30, 2002. At the hearing, Peggy Lafollette, Katarina Slijaz, and Jodi Miller testified under oath as to the circumstances surrounding the alleged sexual abuse, including conversations with M. Rose, personal observations of M. Rose's behavior and/or demeanor, conversations with Mr. and/or Mrs. Rose, and

personal observations of the behavior and/or demeanor of Mr. and/or Mrs. Rose. During the preliminary hearing, Daniel James, submitted a motion to dismiss the emergency custody order. Joyce Stewart, the Guardian Ad Litem, opposed the Roses' motion and argued that the custody order should remain in force.

The Circuit Court of Hampshire County dismissed the Prosecuting Attorney's petition at the October 30, 2002 preliminary hearing. The Court found that (1) Peggy Lafollette was a mandatory reporter and she was required by law to report the incidents as she had reported them to the DHHR; (2) the DHHR is required by law to evaluate all reports of child abuse that the department receives; (3) the DHHR's actions were "appropriate under the circumstances"; and (4) the evidence presented was not sufficient to satisfy the burden of probable cause required to establish child abuse.

DHHR's custody of the Rose children began on October 4, 2002. The DHHR took custody of the children pursuant to, and in accordance with, court orders entered in the Circuit Court of Hampshire County, West Virginia, on October 4, 2002 and October 7, 2002. The October 30, 2002 order ended the period during which the Rose children were in foster care.

Ms. Slijaz (formerly Ms. Sine) gathered and reported facts pursuant to her statutory duty; no evidence demonstrates questionable or improper motives.


## II. LAW

The Fourteenth Amendment of the United States Constitution guarantees each citizen that no State shall, "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. 14. Among the liberty interests protected by the due process clause are a class of protected family rights. Wash. v. Glucksberg, 521 U.S. 702, 720 (U.S. 1997). However, the State has a compelling interest in the protection and welfare of children. Lassiter v. Dept. of Social Services, 452 U.S. 18, 27 (1981). State actions impacting the child welfare and family interests protected under the Fourteenth Amendment are evaluated under a fundamental fairness test. See Weller v. Dept. of Social Services for Baltimore, 901 F.2d 387, 391 (4th Cir. 1990). Under this

standard, state actors will not violate a citizen's due process rights unless they act with gross negligence or arbitrariness that "shocks the conscience." Id. When applying this standard of conscience, the courts recognize both the delicacy of the issues involved in child welfare cases and the need to provide State actors with the flexibility to act on the State's responsibility to protect children. Jordan v. Jackson, 15 F.3d 333, 348-49 (4th Cir. 1994).

## Constitutional Right to Care and Custody of Children

The Supreme Court has held that the guarantee of substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." Glucksberg, 521 U.S. at 720. The interest of a parent in the care and custody of his or her children has repeatedly been recognized as one of these fundamental and constitutionally protected liberty interest. E.g., Kia P. v. McIntyre, 235 F.3d 749 (2d Cir. 2000). This right to care and custody extends to family integrity, where both parents and children have a liberty interest in family integrity and privacy. Pfoltzer v. County of Fairfax, 775 F. Supp. 874, 883 (E.D. Va. 1991); Patterson v. Armstrong County Children and Youth Services, 141 F. Supp. 2d 512, 522 (W.D. Pa. 2001). The recognized liberty interests are entitled to protection under the due process clause of the Fourteenth Amendment, however, such liberty interests are not absolute. 141 F. Supp.2d at 522.

## Limitations to Parental Rights

Parents have substantive private interests in the care, custody and control of children, but the state shares an interest as well. "No matter how important the right to family integrity, it does not automatically override the sometimes competing compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." Kia P. v. McIntyre, 235 F.3d at 758. In addition, the State of West Virginia as parens patriae also has a compelling interest in the safety and welfare of its children. See Lassiter, 452 U.S. at 27; Jordan v. Jackson, 15 F.3d 333.

<u>Applicable Test: "Shock the Conscience"</u>

The applicable test for determining whether the actions or inactions of the government violated one's substantive due process rights is the "shock the conscience" test. <u>Weller</u>, 901 F.2d at 391, <u>Pfolzer</u>, 775 F. Supp. at 883.  To violate due process rights, a government official "need not have acted with the purpose to cause harm, but the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed shocks the conscience." <u>Patterson</u>, 141 F. Supp.2d at 522.


<u>Actions of Child Welfare Agencies</u>

In line with the conscience test, the Supreme Court has repeatedly stated that procedural due process requirements are flexible.  See, e.g., <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44 (1991); <u>Mathews v. Eldridge</u>, 424, U.S. 319 (1976). Furthermore, in child welfare cases, actions of state officials are to be given great deference by the courts:

> [C]onsiderable deference must be accorded to the delicate judgments made
> by responsible state officials.  Perhaps in no context is this truer than
> where the state is acting as *parens patriae* to protect children from
> imminent danger.  'This area has been left to the States from time
> immemorial, and not without good reason.'  In this area especially, while
> of course clear constitutional requirements cannot be ignored, 'substantial
> weight must be given to the good-faith judgments of the individuals
> [administering a program] … that the procedures they have provided
> assure fair consideration of the ….claims of individuals.

<u>Jordan v. Jackson</u>, 15 F.3d at 348-49 (citations omitted).

Specifically, in <u>Weller</u>, the Fourth Circuit held that, "[i]t does not shock the conscience to hear

that defendants removed a child in emergency action from the custody of a parent suspected of abusing him, based upon some evidence of child abuse." Weller, 901 F.2d at 391. The Court went on to point out that "substantive due process does not categorically bar the government from altering parental custody rights." Id at 392.

## III. ANALYSIS OF CLAIMS PRESENTED

### Claims 1-5: State Action on Family Integrity and Parents' Custody Rights

In the matter now before the Court, the plaintiffs seek to impose liability on the defendants for removal of their children, who were taken from their home, pursuant to a court order, due to alleged child sexual abuse. In their first five stated causes of action, plaintiffs allege they were harmed by defendants' removal of the Rose children from their parents' custody without due process, probable cause, or adequate investigation, and by improperly trained and supervised State employees. The court accepts the parties' agreed assessment of the relevant facts and law, concluding that the procedures followed in this case did not deny plaintiffs their due process rights since Defendants' involved the judiciary before taking any action and thus provided opportunity for the plaintiffs or their interests to be heard.

On October 4, 2002, the Department issued a request for emergency custody that was heard by Shirley Timbrook, a magistrate and juvenile referee. Magistrate Timbrook further reviewed the abuse allegations in the request for custody with the presiding circuit court judge, who noted the date and time of his approval on the face of Magistrate Timbrook's order. Additionally, plaintiffs were heard in response to the October 7, 2002 order temporarily removing the Rose children from their parents' custody and continuing their placement in foster care. The hearing on the removal order, originally scheduled for October 15, 2005, was held October 30, 2002.

The facts supporting the custody order were attested to before the Circuit Court of Hampshire County and, while the presiding Judge found the actions of the Department to be "appropriate," the Circuit Court was not satisfied that there was probable cause to believe abuse was occurring.

Despite the ultimate order returning custody of the Rose children to their parents, allegations that defendants acted without probable cause are overcome by two court orders that found there was probable cause to act. Furthermore, the judge dismissing the matter invited the Department to re-file its petition if any additional evidence of abuse came to light. The record contains no facts or events that demonstrate gross negligence or intentional harms that would "shock the conscience."

Plaintiffs further argue that inadequate oversight and training of DHHR personnel rises to the level of a constitutional violation. The issue centers upon disagreement over the meaning of what the eldest Rose child told Ms. Slijaz (formerly Ms. Sine) at the Capon Bridge School. M. Rose's mother was able to explain that her child's statement to Ms. Slijaz was simply misunderstood melodrama and exaggeration. However, in this case, concern with the State's handling of child interviews becomes moot despite the disagreement, because additional facts suggesting abuse had to be acted upon.

As responsible State employees, defendants are charged with the duty to investigate all allegations of abuse by law. In this case, defendants responded to the report of the minor's teacher, who asserted her belief that a child was being sexually abused by her father. The defendants (1) conducted an investigation, which included interviewing the minor child and her teacher; (2) consulted with their supervisors and the Prosecuting Attorney who reached the conclusion that the plaintiffs' children were in imminent danger of harm; and (3) filed a petition with the court for an emergency custody order, which was subsequently granted.

The facts underlying the claim were fully set forth in a memorandum, a verified petition and in testimony before the Circuit Court of Hampshire County. Only after receiving the order from the court did the defendant social workers take the children into custody.

The overall facts of the case, including that the defendants acted pursuant to court order, do not "shock the conscience." To the contrary, when viewed favorably, the facts of the case suggest defendants meet the standard of using, "their best professional judgment in deciding to remove the children." Pfoltzer, 775 F. Supp. at 884. In view of the overall basis of the action, a

misunderstanding over what the eldest Rose child's statements meant does not give rise to a constitutional violation.  Martin v. St. Mary's Dep't of Soc. Servs.,  346 F. 3d 502, 507 (4th Cir. 2003).  Therefore, as to plaintiffs' first five claims, defendants' actions do not rise to the level of a constitutional violation.

### Claims 6-9: Allegations of Abuse while in Foster Care

Plaintiffs allege in their sixth through ninth claims that defendants are liable for any harms suffered by the minor children while they were in the custody and control of foster parents. However, under established law, due process rights do not render defendants liable for alleged mistreatment of the Rose children while they were in foster care.  In DeShaney v. Winnebago County Dep't of Social Servs., the Supreme Court, "held that a State's failure to protect an individual against private violence does not violate substantive due process rights, because the State has no duty to provide its members with adequate protective services."  DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189 (1989). See Weller, 901 F.2d 387.  The State does not become the "permanent guarantor" of the children's safety due to the transfer of physical custody.  Weller, 901 F.2d 387, citing DeShaney, 489 U.S. 189.  While the Supreme Court failed to discuss whether it would come to the same conclusion if a foster home was operated by the state agents themselves, in so doing, they drew a distinction between foster homes run by private individuals and any home that might be operated by a state agent.  Id.

The Fourth Circuit consistently applies the High Court's implied distinction, holding that any harm suffered by a child at the hands of foster parents is not deemed harm inflicted by state agents. Weller, 901 F.2d 387, citing Milburn v. Anne Arundel County Dep't of Social Services, 871 F.2d 474 (4th Cir. 1989), (cert. denied 493 U.S. 850 (1989).  "Foster homes operated by private citizens are not comparable to state institutions that might more accurately be characterized by the terms 'incarceration' and 'institutionalization.'"  Pfoltzer , 775 F. Supp. At 885 (memorandum opinion). Furthermore, the fact that foster parents sign a contract with the state agency and/or the foster home

was licensed by the State are not sufficient to convert private parties, namely foster parents, into state actors. Id at 891.

In this case, Defendants would not be liable for claims of misconduct arising out of the Rose children's time in foster care. Like the home in Weller, the home into which the Rose children were temporarily placed was not operated by the State or its agents. As the Supreme Court held in DeShaney, the State of West Virginia, its agencies and its officials would not be liable for any alleged claims based on the foster care of children, because, under civil law, the state does not guarantee the protection of children from private, third parties.

### Claims 10-11: Due Process Claims based Upon Violations of State Law

Plaintiffs further claim they were denied their due process rights due to violations of state law. Any alleged violations of state law alone would not constitute a constitutional tort. "It is settled….that violations of state law cannot provide the basis for a federal due process claim." Pfoltzer, 775 F. Supp. at 881. A specific violation of due process needs to be identified.

In the case at bar, the defendants are protected by West Virginia Code § 49-6A-6. Under this section, those reporting suspecting cases of child abuse or neglect as well as those investigating such cases are immune from civil liability. Specifically, West Virginia Code §49-6A-6 provides:

> [a]ny person, official or institution participating in good faith in any act
> permitted or required by this article shall be immune from any civil or
> criminal liability that otherwise might result by reason of such actions.

The defendants acted in good faith investigating allegations of child sexual abuse. Plaintiffs have not identified any facts that challenge the intentions of the DHHS staff or suggest that they acted in bad faith. Failing such a showing, defendants are immune from civil liability for plaintiffs' West Virginia state law claims.

### IV. CONCLUSION

Accordingly, the Court holds that the Defendants' motion for summary judgment (Document 22) be and hereby is GRANTED. Given the Court's ruling as to the alleged constitutional violations and state law claims, it is unnecessary to reach the other issues raised in the Defendants' motion for summary judgment. The Court's ruling further renders moot the motion filed by the individual defendants for qualified immunity (Document 24) and the Defendants' motion for sanctions (Document 21). These motions are now DENIED as moot.

All of Plaintiffs' claims being resolved against all defendants in this action it is ORDERED and ADJUDGED that the plaintiffs take nothing of the defendants and that this action be and here by is DISMISSED with prejudice.

The clerk is directed to enter this order in and for the date set forth below and to send an attested copy of this order to counsel of record.

Enter this 2nd day of November, 2005.

W. CRAIG BROADWATER
UNITED STATES DISTRICT JUDGE